IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2922
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

JUAN IBARRA, JOHN JOE GUERRERO,
and ROBERT FRANKLIN CHAMBERS,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Southern District of Texas
_____

(June 30, 1992)

Before POLITZ, Chief Judge, KING, WILLIAMS, GARWOOD, JOLLY,
HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE,
EMILIO M. GARZA, and DeMOSS, Circuit Judges.


PER CURIAM:

This case was taken *en banc* solely to review the claim of

Robert Franklin Chambers that his fourth amendment rights were

violated by a search conducted by the authorities.  On that issue

the en banc court is equally divided and, accordingly, the ruling

of the district court suppressing evidence with respect to

Chambers is AFFIRMED.  **United States v. Holmes**, 537 F.2d 227 (5th

Cir. 1976).

E. GRADY JOLLY, Circuit Judge, with whom, POLITZ, Chief Judge, GARWOOD, SMITH, WIENER, EMILIO M. GARZA and DeMOSS, Circuit Judges, join, would affirm the district court for the following reasons:

I would affirm the district court because the law enforcement officers breached the Fourth Amendment when they interpreted Robert Franklin Chambers' simple consent to search the Ashby Street house--knowing that Chambers was only a guest in the house--as authority to break forcibly into a sealed attic space.

                                    I

At approximately 10:00 p.m. on May 21, 1991, several law enforcement officers approached the house located at 215 Ashby Street in Baytown, Texas. They knocked on the door. When Chambers answered the door, an officer explained that they were conducting a narcotics investigation and wanted Chambers' cooperation. Chambers allowed the officers to come inside. The officers told him that on the basis of people who had been seen at the house earlier that day, from whom incriminating records had been seized, they believed that money or drugs were located in the Ashby Street house. Officer Trumps asked Chambers if he could search the house and garage. Chambers said, "That would be

all right."  Chambers was then asked to sign a written Consent to Search form, which, apparently, couches the consent in the broadest possible terms.  Chambers refused.  According to Officer Trumps, "[H]e said the house wasn't his.  He was allowed to stay there for a few days.  I think he had already been there for a few days.  [H]e felt he didn't have the authority to sign the document to allow a search although he was giving us verbal consent."  Chambers told the officers that he had split up with his wife, and that the house belonged to his wife's brother, who was allowing him to stay in the house for a week or so.[1]

---

[1]The officers interpreted this consent as follows:

> THE COURT:  All right.  Let me ask you this: On the basis of that oral [consent], but his unwillingness to sign the consent, did you feel that if you wanted to, you had the right to bring fire axes in, for instance, and chop open the walls?
>
> THE WITNESS:  Yes, sir.
>
> THE COURT:  Do you feel that you had the right to disembowel the appliances and look into the minutia of the air conditioners or the stove, the refrigerator, that sort of thing?
>
> THE WITNESS:  Yes, sir.
>
> THE COURT:  In fact, bringing a backhoe or that sort of thing and dig up the backyard or underneath the foundation of the house?
>
> THE WITNESS:  Yes, sir.
>
> THE COURT:  And you felt that you had all of those rights based on this consent that he gave you orally, even though he refused to sign the form?

During the initial search of the house, the officers found a brown grocery bag containing numerous rubber bands and torn-up pieces of paper, torn pieces of currency, and a pistol underneath a mattress. The officers realized that the house had an attic and soon discovered that the only way to gain access to the attic was through the ceiling of the bedroom closet. The entrance to the attic, however, was sealed off with boards. Through a crack in the boards, the officers were able to see a blue object, but, according to the district court's findings, there was nothing incriminating about this object's appearance.

After the access to the attic was discovered, an officer

> found a sledge hammer and used it to knock out the boards in the ceiling which had been securely placed there. The Court finds it to be incredulous that the sledge hammer was used merely as a tool to push up the boards, given the testimony as to how well secured the boards were and especially considering that Agent Brooks initially made reference to the breaking of boards. Stated another way, having assessed the demeanor and credibility of the witness and having considered Officer Trumps' candidly expressed opinion and belief that the initial general consent authorized virtually a boundless search, by whatever means possible, this Court finds that the agents engaged in flagrant structural demolition of the premises in order to accomplish their objective and purpose which was undertaken as though having no limitations whatsoever.

Findings of Fact and Conclusions of Law, 4-5 (record citations omitted). Once in the attic, the officers found nearly $1,000,000 in cash, ledgers, and a money-counting machine.

---

THE WITNESS: Yes, sir.

-4-

The district court concluded that Chambers "freely and voluntarily consented" to the search of the house and garage, but that such consent "could not reasonably have been interpreted by these agents to have included a structural dismantling of the secured closet ceiling - attic floor by use of a sledge hammering technique." Id. at 8. It held that the items found in the search of the rooms of the house were admissible, but suppressed the evidence found in the attic. The United States appealed, and a panel of this court reversed the district court's suppression order. United States v. Ibarra, 948 F.2d 903 (5th Cir. 1991). We voted to hear en banc only Chambers' claim that his Fourth Amendment rights were violated.

II

The question we consider today is simple but, we think, important. The standard by which we frame this question has been set out by the Supreme Court:

> The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?

Florida v. Jimeno, ___ U.S. ___, 111 S.Ct. 1801, 1803-04 (1991). Translated to this case, the question we are presented is whether a reasonable officer would have understood Chambers' simple assent -- "That would be all right" -- to search the house, in which he was an invited guest, to include consent to forcible

entry into a part of the house that had been securely sealed.

                                    A

     To set the stage for determining whether the officers
exceeded the scope of Chambers' consent, we first examine the
search that followed his consent.  We start with the standard of
review:

>          "While we review questions of law *de novo*,
>     `[i]n reviewing a trial court's ruling on a motion
>     to suppress based on live testimony at a
>     suppression hearing, the trial court's purely
>     factual findings must be accepted unless clearly
>     erroneous, or influenced by an incorrect view of
>     the law, and the evidence must be viewed most
>     favorabl[y] to the party prevailing below."

United States v. Muniz-Melchor, 894 F.2d 1430, 1433-34 (5th

Cir.), cert. denied, 495 U.S. 923 (1990) (quoting United States

v. Maldonado, 735 F.2d 809, 814 (5th Cir. 1984)).[2]

     According to the district court, Agent Patton discovered the
way to gain access to the attic through the ceiling of the
bedroom closet.  The district court found that the attic entrance
was covered by boards "which had been securely placed there."
Agent Patton "found a sledge hammer and used it to knock out the
boards in the ceiling."

     The district court considered testimony that the

---

[2]We further note in passing that when the justification for
a search is based on consent, the government has the burden of
proving that the search was conducted within the scope of the
consent received.  United States v. Strickland, 902 F.2d 937, 941
(11th Cir. 1990); see also Schneckloth v. Bustamonte, 412 U.S.
218, 222 (1973).

sledgehammer was used only as a tool to push up the boards to be "incredulous" in the light of other testimony as to how well secured the boards were.  Indeed, the district court noted, Agent Brooks testified that the boards were broken with the sledgehammer.  We think there is little doubt, when viewed in the light most favorable to Chambers, the prevailing party below, that the evidence supports the district court's finding that the entrance to the attic was securely sealed with boards. Furthermore, the evidence supports the district court's finding regarding the degree of force used by the officers to gain entry into the attic.  Agent Brooks testified on direct examination at the suppression hearing that the attic access was "boarded up fairly securely," and that he "believe[d]" Officer Patton "had to use a hammer to break those boards or loosen them to get up into the attic."  Although on cross-examination, Brooks altered his testimony somewhat to say that Officer Patton "didn't use a sledgehammer violently," but more as "a tool to push up on the boards that were securing that hole," the district court, "having assessed the demeanor and credibility of the witness," found this altered testimony "incredulous."  The district court was entitled to choose between the two versions, and to find that the attic was a sealed-off space and that the boards securing the attic entrance were broken with the sledgehammer.  We recognize that it is not the role of the appellate court to substitute its own judgment for such supported findings of the district court.

Indeed, the Supreme Court has told us in straightforward language that the "clearly erroneous" standard of review "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).[3] The district court, as we have noted, expressly stated that its factual findings with respect to the degree of force and the extent of damage to the attic entrance were based on its assessment of the demeanor and credibility of the witnesses. We think that it is unjustifiable, under the governing standard of review, for us to disregard those findings. We therefore accept the finding that the use of a sledgehammer to break the boards securing the attic entrance

---

[3]Those who would reverse seize upon the district court's characterization of the damage to the attic entrance as "structural demolition," to reach the conclusion that the finding is clearly erroneous. They seek to minimize the damage found by the district court by describing the police conduct as the mere removal of "a barrier blocking a visible access that had been created before their arrival." In doing so, however, they apply their own subjective interpretation of those words, and substitute their narrow view of what constitutes a "structure" for the district court's equally plausible, but broader, view. We, of course, agree that if "structural demolition" can only mean such destruction as would render a house uninhabitable, there was no "structural demolition." Although it may not be the only manner of expressing the damage done by the police, we think that the district court's characterization of a secure barrier of boards sealing off a part of the house as a "structure" is certainly plausible under the facts of this case.

constituted a "structural demolition" of the entrance to the attic.[4]

B

We now consider the central issue:  whether the search exceeded the scope of Chambers' consent.  The district court's relevant factual findings regarding the circumstances of that consent are amply supported by the record.  Chambers told the officers that he did not own the house, but was only a guest there.  In response to the officers' request for permission to search the house and garage, Chambers simply stated, "That would be all right."  The district court found, however, that "he adamantly declined and refused to sign [a] written Consent to Search form."  Officer Trumps testified that Chambers refused to sign the form because he did not own the house and, therefore, felt that he did not have the authority to do so.  Despite the officers' attempts to convince Chambers that he had authority to sign the consent form, he remained steadfast in his refusal because it was not his house.

As we have stated previously, the Supreme Court has defined the standard for measuring the scope of consent as one of "`objective' reasonableness--what would the typical reasonable

---

[4]As an additional ground for suppressing the evidence found in the attic, the district court held that the officers' conduct violated the Due Process Clause.  Because rehearing was granted only on Chambers' Fourth Amendment claim, the panel's reversal of that ruling is undisturbed.

person have understood by the exchange between the officer and the suspect?"  Florida v. Jimeno, ___ U.S. at ___, 111 S.Ct. at 1803-04.  Although the question of objective reasonableness is a question of law, the factual circumstances surrounding the consent are central to determining the nature of the consent and how it would have been understood by a reasonable person.  We, of course, are not bound by the district court's conclusions of law.  We must observe, however, that the district judge had the opportunity to observe the demeanor of the witnesses and judge their credibility, and he concluded that the consent could not possibly have been understood as permission for the officers to use a sledge hammer to break the boards securing the entrance to the attic.  Viewing the record as a whole in the light most supportive of the district court's ruling, we agree.

"[T]his Nation's traditions are strongly opposed to using force without definite authority to break down doors."  Colonnade Catering Corp. v. United States, 397 U.S. 72, 77 (1970).[5]  In the light of the circumstances that led to the consent -- that

_____

[5]Colonnade supports those who would reverse not at all.  In Colonnade, the agents had statutory permission to be on the premises and to conduct a search; in short, they had the equivalent of general consent to search the premises.  397 U.S. at 74.  When, however, it came to breaking through a locked door, the Court held that the agents' statutory authority to search was not enough; definite authority, such as a warrant to break and enter, was required.  Id. at 74, 77.  Here, those who would reverse do not argue that the officers had definite authority to break the boards securing the attic entrance, but claim that such authority was implicit in the general consent given by Chambers.  Colonnade specifically rejects such a conclusion.

Chambers was only a guest in the house and his "adamant" refusal to sign a Consent to search form -- we reject the notion that the simple assent -- "That would be all right" -- can reasonably and objectively be understood as Chambers' tacit authorization for the police to take a sledgehammer and break their way into a part of the house that had been securely sealed with boards.  The fact that Chambers neglected to foresee the officers' conduct and failed specifically to state any limitations on his permission to search the house is, we think, an insufficient basis for interpreting his consent as authorizing the officers to damage the house or any property in it.[6]

> When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless.  Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass. . . .
>
> . . . [A] police officer could not reasonably interpret a general statement of consent to search an individual's vehicle to include the intentional infliction of damage to the vehicle or the property contained within it.  Although an individual consenting to a vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts or contents.  Indeed, it is difficult to conceive of any circumstance in which an individual would voluntarily consent to have the spare tire of their automobile slashed.  Unless an individual

---

[6]Nor is Chambers' apparent silence while the officers sledge-hammered their way into the attic suprising, inasmuch as he was alone in the house and greatly outnumbered by law enforcement officers who had already found some evidence of an incriminating nature.

> specifically consents to police conduct that
> exceeds the reasonable bounds of a general
> statement of consent, that portion of the search
> is impermissible.

United States v. Strickland, 902 F.2d 937, 941-42 (11th Cir. 1990). Cf. Jimeno, ___ U.S. at ___, 111 S.Ct. at 1804 ("It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag.")

There is an additional reason, grounded in strong policy concerns, that we are not inclined to construe the simple assent that was given in this case as an agreement to allow the dismantling of any part of the house or as permission to destroy any property in the house. The Supreme Court has stated that "the community has a real interest in encouraging consent, for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may ensure that a wholly innocent person is not wrongly charged with a criminal offense." Schneckloth v. Bustamonte, 412 U.S. 218, 243 (1973). It is obvious to us that citizens will have greater incentives to permit consensual searches of their property if they have some assurance that law enforcement officers will respect their premises while conducting such searches. The community's interest in encouraging consent would not be advanced by interpreting Chambers' simple assent to the search of the house

-12-

to include consent to break forcibly into the sealed attic space with a sledgehammer.

### III

We would hold that a typical reasonable person would not have interpreted Chambers' consent to extend to breaking the boards securing the attic entrance.  Accordingly, for the foregoing reasons, we would affirm the district court's order granting Chambers' motion to suppress the evidence seized from the attic of the Ashby Street house.

DUHÉ, Circuit Judge, with whom KING, WILLIAMS, HIGGINBOTHAM, DAVIS, JONES and BARKSDALE, Circuit Judges, join, would reverse the district court for the following reasons:

The United States appeals the district court order suppressing evidence seized pursuant to a consent search.  We voted to hear en banc the claim of Appellee Robert Franklin Chambers that his Fourth Amendment rights were violated by the search of the Ashby Street house, and that the evidence seized therefrom should be suppressed.[7]  I would reverse and remand.

---

[7]  With regard to Chambers's due process claim and the standing and cross-appeals of his co-defendants, the panel opinion remains in force.

**Facts**

After arresting two men suspected of drug trafficking and money laundering, Houston police went to 215 Ashby Street, a house both men had visited that day. Appellee Chambers answered the door and, after the officers asked to come in, allowed them to enter. The officers told Chambers of their investigation. Chambers told them that he had been living in the house for two weeks. The officers asked if they could search the house and garage for evidence of money laundering and drug trafficking, and Chambers agreed. The officers then presented Chambers with a consent form, which they read in part to him and which he perused. Chambers, however, refused to sign a consent form, stating that he did not own the house, his brother-in-law did.

The Ashby Street house consisted of a bedroom with a closet, a kitchen, a living room, a bathroom, and an attic. On their first time through the house, the officers found rubberbands and paper (items typically used by money launderers to divide and label cash) in the kitchen and ripped currency and a gun in the bedroom. One officer then went outside to see if the house had attic or cellar space. Noting that it had an attic, he returned inside to search for an entrance. One was found, boarded up, in the bedroom closet. The police then used a sledgehammer to remove the boards. Upon entering the attic, they found nearly $1,000,000 in cash, ledgers, and a money counting machine.

Upon the motion of Appellee Chambers, the district court suppressed the evidence found in the attic. From the bench the district court judge gave the reasons for his ruling. He

indicated that Chambers gave a "reasonably knowing and appropriate" consent to search the house and garage.  Though the judge believed the search of the rooms and the garage of the house to be reasonable, he found that the search of the attic was not, stating that by the time the police found the attic entrance, Chambers was constructively under arrest.  The judge further stated that having found evidence of money laundering, probable cause was clearly established and the intervention of a magistrate was necessary to determine the propriety of entering the attic.

The district court judge later submitted written reasons for suppressing the evidence found on Ashby Street.  He found that Chambers's consent to search the house had been free and voluntary, but could not have included consent to structurally dismantle the secured closet ceiling by use of a sledgehammer. The judge also concluded that the Due Process Clause called for suppression, finding that the conduct of the officers was "outrageous" and qualified "as the sort of arbitrary and capricious police conduct that shocks [a court's] sense of justice and fundamental fair play."

**Analysis**

To establish a Fourth Amendment violation, Chambers must show that he had a legitimate expectation of privacy in the area searched.  Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. Antone, 753 F.2d 1301, 1306 (5th Cir.), cert. denied,

474 U.S. 818 (1985).  In assessing whether a legitimate expectation of privacy exists, we examine several factors including:

> whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises.

United States v. Haydel, 649 F.2d 1152, 1155 (5th Cir. Unit A July 1981), cert. denied, 455 U.S. 1022 (1982).

Chambers resided in the house; in fact the district court found that he was the sole occupant.  He exerted control over it and was legitimately on the premises. Chambers, therefore, has standing to object to the submission of evidence found there.

When reviewing a district court's suppression ruling, we accept the court's factual findings unless they are "clearly erroneous or influenced by an incorrect view of the law."  United States v. Lanford, 838 F.2d 1351, 1354 (5th Cir. 1988).   The district court's ultimate conclusions of Fourth Amendment reasonableness, however, are subject to de novo review.  United States v. Colin, 928 F.2d 676, 678 (5th Cir. 1991).

I adopt the factual findings of the district court with one exception.  Because I find no support for the district court's finding that the police structurally dismantled the attic entrance, I reject it as clearly erroneous.  None of the

testimony offered to the court suggests that the police disturbed the structural integrity of the Ashby Street house. To the contrary, the record indicates that the house was built with an attic space and that an access to this space was located in the ceiling of the bedroom closet. Though this hole was covered by boards, through them one could see what appeared to be a bag, indicating that the attic was in use. The police did not alter the frame of the house; they removed a barrier blocking a visible access that had been created before their arrival.

The removal of such a barrier does not constitute a Fourth Amendment violation. The police may search without a warrant when they have consent to do so from a person with authority to give consent. <u>Illinois v. Rodriquez</u>, 497 U.S. 177, 110 S. Ct. 2793, 2797 (1990). Chambers, though not the owner of the house, resided there as its sole occupant and thus had authority to consent to the search.[8] The district court found, and I agree,

---

[8] We are not, therefore, faced with a question of third-person authority, an issue that frequently arises when a third party allows the police to inspect an absent owner's belongings. The owner of the Ashby Street house is not a party to this appeal. In third-party situations, the absent owner's expectations of privacy may play a role in determining whether the third party had authority to consent. <u>See</u> <u>United States v. Kinney</u>, 953 F.2d 863, 866 (4th Cir. 1992) (Girlfriend who had never opened defendant's locked closet lacked authority to consent to the search of the closet.), <u>petition for cert. filed</u>, (U.S. May 8, 1992); <u>United States v. Block</u>, 590 F.2d 535, 540, 542 (4th Cir. 1978) (Defendant's mother had no authority to search locked footlocker when mother asserted defendant's claim of privacy over it and disclaimed any right of access to it.).

that his consent was voluntary.[9] Unlike the district court, however, I find that the consent to search extended to the attic.

Whether Chambers agreed to a search of the attic is a question of objective reasonableness: would "the typical reasonable person" understand the consent to extend to the attic? Florida v. Jimeno, 111 S. Ct. 1801, 1803 (1991). Such a question of objective reasonableness is a question of law subject to de novo review. See United States v. Harrison, 918 F.2d 469 (5th Cir. 1990) (reasonableness of investigatory stop is a conclusion of law); United States v. Tedford, 875 F.2d 446, 448-49 (5th Cir. 1989) (objective reasonable reliance on search warrant is a question of law). Chambers consented to a general search of the premises for evidence of drug trafficking and money laundering. He had the ability to limit the scope of the search "in the same way that the specifications of a warrant limit a search pursuant to that warrant." United States v. Dichiarinte, 445 F.2d 126,

---

[9] Chambers contests this finding. The issue of voluntariness is central to suppression of the attic evidence as well as the admissibility of the kitchen and bedroom evidence. To the extent that an appeal of the voluntariness finding constitutes an appeal from the denial of Chambers's motion to suppress the kitchen and bedroom evidence, it is impermissible. United States v. Martin, 682 F.2d 506, 508 (5th Cir.), cert. denied, 459 U.S. 1088 (1982). With respect to the attic evidence, because the voluntariness claim, if successful, would necessitate suppression of all evidence found at the Ashby Street house, entitling Chambers, who has not cross-appealed, to greater relief in this Court than he obtained from the district court, he may not assert it. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 109 S. Ct. 2782, 2788 (1989); United States v. New York Telephone Co., 434 U.S. 159, 166 n.8 (1977).

129 n.3 (7th Cir. 1971).  But Chambers did not restrict the search in any way, at any time, although he presumably was aware of his right to do so, having read the consent form offered him,[10] and was present throughout the search's duration.  I find that an objective onlooker could understand this general consent to extend to all integral parts of the house -- closets, attic, and basement (had there been one) included -- in which evidence of drug trafficking or money laundering could be found.[11]

Having authorized a search of the entire house, Chambers no longer held a reasonable expectation of privacy in any of its compartments.  That entry to one chamber was difficult does not alter this conclusion.  The Supreme Court has stated that "a lawful search extends to the entire area in which an object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."  United States v. Ross,  456 U.S. 798, 820-21 (1982).  Though the search in Ross was based on probable cause, its reasoning applies equally to consent cases.  See

---

[10]  It is not necessary, however, that the police establish Chambers's "knowledge of his right to refuse consent." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

[11] One officer testified in response to the court's leading question that this consent would authorize him to chop open the walls with a fire ax or dig up the foundations with a backhoe. This subjective belief evinces a terrible misunderstanding of the reasonable bounds of the consent.  What the officers thought they could do is irrelevant in examining the objective reasonableness of what they in fact did.

United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992) (finding that the forced opening of the locked trunk of a car stored in a mini-warehouse was authorized pursuant to the defendant's consent to search the mini-warehouse for narcotics).

That force was used to effect the separate act of entry does not necessarily render the search unreasonable. In Colonnade Catering Corp. v. United States, for example, the Court addressed whether an IRS agent without a warrant, and over the owner's objections, was authorized to enter a locked storage room pursuant to 26 U.S.C. § 7342, a statute levying fines against owners who refused to admit Treasury Department officials on their premises. 397 U.S. 72, 74 (1970). Finding that the statute did not authorize forcible, warrantless entries, the Court referred to this "Nation's traditions that are strongly opposed to using force _without_ _authority_ to break down doors." Id. at 77 (emphasis added).

Unlike the agent in Colonnade, the officers in the Ashby Street house had authority for their search -- the express verbal consent of Chambers. In further contrast, they were not met with explicit opposition to their entry, as was the Colonnade agent. To ignore the "without authority" language of the Colonnade dictum would render impermissible much police action that we regularly condone. For example, officers with warrants who are refused entry are authorized by statute to break open doors and windows. 18 U.S.C. § 3109 (1985).

-20-

Indeed, that officers with warrants are permitted to "break open any outer or inner door or window of a house, or <u>any part of a house, or anything therein,</u> to execute a search warrant" when refused admittance, <u>id.</u>, strengthens my conclusion that the forced entry into the attic was reasonably within the scope of Chambers's consent.[12]  For, Chambers's consent, unconditional as it was, permitted the police to conduct the search "precisely the same way as if the police has obtained a warrant."  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 243 (1973).

Appellee Chambers calls to our attention two automobile consent-search cases.  <u>Jimeno</u>, 111 S. Ct. at 1802; <u>United States v. Strickland</u>, 902 F.2d 937 (11th Cir. 1990).  In both cases, the defendants gave the police unrestricted consent to search their cars for narcotics.  In <u>Jimeno</u>, the police opened a paper bag found on the car's floorboard.  The Supreme Court held that the search of the bag was objectively reasonable, but distinguished its holding from a Florida Supreme Court case suppressing evidence found in a locked briefcase.  The Court noted that "it is very likely unreasonable to think that a suspect by consenting to the search of his trunk has agreed to the breaking open of a

---

[12]  The Supreme Court also has contemplated the use of force to execute warrants:

> [T]he orderly completion of the search may be facilitated if the occupants of the premises are present.  Their self-interest may induce them to open locked doors or locked containers to avoid the use of force . . . ."

<u>Michigan v. Summers</u>, 452 U.S. 692, 703 (1981).

-21-

locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." <u>Jimeno</u>, 111 S. Ct. at 1804.

In <u>Strickland</u>, one officer slashed open a spare tire found in the defendant's car trunk. The Eleventh Circuit upheld the introduction of the evidence found in the tire on the basis of the officer's probable cause to suspect that the tire held contraband. <u>Strickland</u>, 902 F.2d at 943. The court, however, noted that the intrusion had exceeded the reasonable bounds of the defendant's consent. <u>Id.</u> at 942. In both cases, therefore, without suppressing the evidence found in either search, the courts suggested it was unreasonable for officers to break into sealed or locked objects found pursuant to consent searches.

This holding does not extend to such situations in which locked containers or sealed objects -- entities independent of the compartments in question -- are found, and opened, during otherwise permissible searches.[13] Today we face only the

_____

[13] The courts, however, have addressed the issue previously with respect to warrant searches, <u>see</u> <u>United States v. Gonzalez</u>, 940 F.2d 1413, 1420 (11th Cir. 1991) (valid warrant to search defendant's house for documents and currency authorized search of locked briefcase found in house), <u>cert. denied</u>, 112 S.Ct. 910 (1992); <u>United States v. Morris</u>, 647 F.2d 568, 572-72 (5th Cir. Unit B 1981) (valid warrant to search defendant's home for proceeds of bank robbery authorized search of locked jewelry box), and consent searches, <u>see</u> <u>United States v. Lechuga</u>, 925 F.2d 1035 (7th Cir. 1991) (search of suitcase inside closet was permissible pursuant to general consent to search apartment); <u>United States v. Martinez</u>, 949 F.2d 1117 (11th Cir. 1991) (consent to search mini-warehouse extends to locked car trunk found there); <u>United States v. Sealey</u>, 830

situation in which the police, in attempting to enter an area reasonably understood to be within the scope of the consent, forcibly removed a barrier to the existing passageway to an area in the house without damaging its structure.  Chambers, as sole occupant, had authority to consent to the search.  He did consent to a search of the house without restricting the scope of that search, thereby  relinquishing his expectation of privacy in the attic.  Other means of access were unavailable.  Based on these facts, I would hold that the police conduct in this case was reasonable.

---

F.2d 1028 (9th Cir. 1987) (searches of sealed containers in garage and travel bag in bedroom were permissible).