FILED
United States Court of Appeals
Tenth Circuit

June 4, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RUSSELL PIKYAVIT,

Defendant-Appellant.

No. 07-4113

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:06-CR-407-PGC)**

---

Bretta Pirie, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, and Scott Keith Wilson, Assistant Federal Public Defender, with her on the briefs) Office of Federal Public Defender, Salt Lake City, Utah.

Diana Hagen, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with her on the brief) Office of the United States Attorney, Salt Lake City, Utah.

---

Before **O'BRIEN**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Following a fight outside his house, Russell Pikyavit was arrested and jailed along with four other men. A week later while still in jail, Pikyavit directed the police to visit the home and examine the living quarters for evidence of a fight that would show he was not the aggressor. The police visited the home as Pikyavit directed, but found the front door locked when they arrived. They slipped the lock and searched the home. During the search, police found ammunition in plain view.

Pikyavit was indicted on one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). A jury found him guilty and he was sentenced to 180 months imprisonment. On appeal, he argues that although he consented to a limited search of his home, the police exceeded the scope of his consent by entering the locked front door and searching beyond the living room and kitchen. Pikyavit asks this court to declare the search unconstitutional and suppress the ammunition found in a bedroom.

We conclude the search did not exceed the scope of Pikyavit's consent and the district court therefore correctly denied Pikyavit's motion to suppress. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. Background

On the night of April 26, 2006, Millard County police responded to a brawl between Pikyavit and several other men near Pikyavit's home. Pikyavit and the others exhibited various wounds and were bleeding, some of them heavily.

Officers arrested Pikyavit and four others believed to have been involved in the fight. After Pikyavit had been in jail for around one week, his brother visited Pikyavit's home, and discovered evidence suggesting Pikyavit was not the aggressor in the fight. The brother told Pikyavit about this evidence. Pikyavit, eager to support his claim that he was a victim of violence, rather than an aggressor, asked to speak with the officers investigating the incident. He spoke with both Detective Jacobson and Deputy Carter.

Pikyavit spoke first with Jacobson. He told the officer the fight had taken place in his home and there was evidence inside. He said his brother had seen blood in the kitchen and on a wooden board in front of the house. Pikyavit then spoke with Deputy Carter. He reiterated the fight had taken place in his home and that he wanted the police to search it for evidence supporting his innocence. Pikyavit told Carter evidence of the fight, including remnants of his blood and hair, would be located throughout the house and would show he was defending himself. Pikyavit also told Carter the door would be unlocked. Because of this statement, Carter did not think he needed a key.

Deputy Carter proceeded to Pikyavit's home to search for evidence of the fight. When he and another officer arrived at the home, they discovered both the front and back doors were locked. The officers used a plastic card to slip open the lock on the front door and enter the home. Looking for signs of the fight as described by Pikyavit, they entered the living room and kitchen, but did not find

-3-

any evidence. Deputy Carter then opened a door leading from the main hallway. Inside that room, he found ammunition in plain view. Carter realized that Pikyavit, a former felon, could not legally possess the ammunition. Carter and his fellow officer therefore left the house, obtained a warrant, and then returned to search the rest of the home. During the subsequent search, they found additional ammunition and a firearm.

Based on this evidence, Pikyavit was found guilty of one count of being a felon in possession of ammunition. On appeal, he challenges the admission of the ammunition into evidence, claiming he did not consent to the search of his home—let alone the room in which the ammunition was found. Pikyavit therefore asks us to reverse the district court's denial of his motion to suppress.

## II. Discussion

### A. Standard of Review

Where the defendant raises a Fourth Amendment challenge to a search by police, we review the district court's factual findings for clear error, and the ultimate reasonableness of the search *de novo*. *United States v. Contreras*, 506 F.3d 1031, 1035 (10th Cir. 2007); *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205 (10th Cir. 2007); *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). In this case, we deal solely with a factual issue: whether the officers stayed within the scope of the defendant's consent to search.

-4-

We review the district court's factual findings regarding the scope of a defendant's consent for clear error. *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004); *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) (citing *United States v. Sierra-Hernandez*, 581 F.2d 760, 764 (9th Cir. 1978) (concluding "whether or not the search remained within the boundaries of the consent" was "a question of facts" reviewed for clear error)). "Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court's findings will be upheld unless they are clearly erroneous." *Kimoana*, 383 F.3d at 1223.[1]

---

[1] The First Circuit has alluded to a circuit split concerning the appropriate standard of review for determining the scope of a defendant's consent. *See United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002) (citing *United States v. Turner*, 169 F.3d 84, 87 n.4 (1st Cir. 1999)). We think any split is more illusory than real. Every case notes the fact-intensive nature of the inquiry and the deference given to the lower court's determination. *See United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005); *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1131 (9th Cir. 2005); *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004); *United States v. Garrido-Santana*, 360 F.3d 565, 570 (6th Cir. 2004); *United States v. Maldonado*, 38 F.3d 936, 941–42 (7th Cir. 1994); *United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993); *United States v. Blake*, 888 F.2d 795, 800 (11th Cir. 1989). Only the Fifth Circuit has arguably employed a standard other than clear error, *see United States v. Stewart*, 93 F.3d 189, 192 (5th Cir. 1996), but even that circuit has noted the importance of the district court's factual findings concerning the scope of consent. *E.g.*, *United States v. Ibarra*, 965 F.2d 1354, 1357 (5th Cir. 1992) (en banc) (7–7 decision) (recognizing "the factual circumstances surrounding the consent are central to determining the nature of the consent and how it would have been understood by a reasonable person").

Thus, in this case we will uphold the district court's determination that the police stayed within the scope of Pikyavit's consent unless such determination is clearly erroneous. A finding is clearly erroneous if, after reviewing all the evidence, a court is left with "the definite and firm conviction that a mistake has been made." *United States v. Martinez*, 512 F.3d 1268, 1276 (10th Cir. 2008) (quotation omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

Finally, in conducting our review of the district court's decision, we look at the facts in the light most favorable to the prevailing party below—in this case, the government. *See Kimoana*, 383 F.3d at 1223 ("In ascertaining whether officers exceeded the scope of consent, the court must view the facts in the light most favorable to the government."); *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996) ("We determine from the totality of the circumstances whether a search remains within the boundaries of the consent given and view the evidence in the light most favorable to the government.").

*B. Consent to Search*

The Fourth Amendment protects individuals against unreasonable governmental searches and seizures. A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *see also Pena*, 143 F.3d at 1366 ("[I]t is

well settled that 'one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.'" (quoting *Schneckloth*, 412 U.S. at 219)).

"When law enforcement officers rely upon consent to justify a warrantless search, the scope of the consent determines the permissible scope of the search." *United States v. Jackson*, 381 F.3d 984, 988 (10th Cir. 2004) (quoting *United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003)); *see also United States v. Anderson*, 114 F.3d 1059, 1065 (10th Cir. 1997) (concluding that by giving officer consent to "scout around" his vehicle, defendant consented to full search of it, including underneath and around it); *Espinosa*, 782 F.2d at 892 (concluding that by giving officer consent to "look through" his vehicle, defendant consented to thorough search of entire vehicle).

"We apply an objective reasonableness test to measure the scope of a person's consent," and ask, "What would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Anderson*, 114 F.3d at 1065 (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Our task is to determine "what the typical reasonable person would have understood to be the scope of his or her consent under the circumstances." *Pena*, 143 F.3d at 1367–68; *accord United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004) (stating the test as "what a reasonable person would have understood to be the scope and duration of his consent under the circumstances").

In this case, Pikyavit argues the police exceeded the scope of his consent to search his home in two ways. He claims his consent to search his home did not extend (1) to a situation in which his home's doors were locked, or (2) to any rooms in his house besides the kitchen and living room.

*1. Consent to enter despite the locked doors*

The scope of the consent to search is "generally defined by its expressed object," looking to what "the typical reasonable person would have understood by the exchange between the officer and the suspect." *Jimeno*, 500 U.S. at 251. We conclude a reasonable person would have understood Pikyavit's words to the police as giving consent to enter his home to search for exculpatory evidence even if the doors were locked if entry could be made without property damage. A reasonable person would have reached this understanding for a variety of reasons, including: (1) Pikyavit did not expressly condition or otherwise limit the scope of the search on finding the front door unlocked; (2) Pikyavit initiated the encounter with police; and (3) Pikyavit wanted the search to commence quickly so evidence he hoped police would find, including blood, hair, and other signs of a fight, could be used to exonerate him.

First, Pikyavit did not expressly condition the search of his home on the police finding the doors unlocked. "[A] defendant's failure to limit the scope of a general authorization to search" is a factor indicating the search was within the scope of consent. *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999).

-8-

Pikyavit gave the officers general consent to search his home for evidence of the fight. Without words of limitation or condition, the reasonable inference from Pikyavit's conversations with Jacobson and Carter was he had impliedly consented to the search of his home even if the doors were locked. *See People v. Superior Court*, 116 Cal. Rptr. 24, 26 (Cal. Ct. App. 1974) (finding defendant impliedly consented to search of dresser drawer because "[w]ords may imply consent as well as express it"); *see also* Wayne R. LaFave, *Search and Seizure* § 8.1(c) at 19 (4th ed. 2004) (noting the importance of taking into account "any express or implied limitations or qualifications" on the scope of consent). This factor is especially important given the urgency with which Pikyavit hoped the search would be conducted and the result he hoped to obtain—exoneration.

That the police used a card to open the front door does not vitiate the generalized consent Pikyavit gave to search the home. Once a generalized consent to search is given, the police can use reasonable means to enter the location to be searched. *See United States v. Maynes-Ortega*, 857 F.2d 686, 688–89 (10th Cir. 1988) (upholding search of car's trunk despite the defendant claiming he did not have a trunk key and police using a key they found between car's front seats); *see also United States v. Flowal*, 234 F.3d 932, 934–35 (6th Cir. 2000) (upholding search of defendant's luggage despite police officers' lack of a key and need to open the luggage by other means), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377, 382 (6th Cir. 2002); *United*

*States v. Milian-Rodriguez*, 759 F.2d 1558, 1563–64 (11th Cir. 1985) (upholding search of closet even though police picked the closet's lock); *State v. Lash*, 204 S.E.2d 563, 565 (N.C. Ct. App. 1974) (upholding search of vehicle's trunk even though police entered through back seat because trunk key was missing).

The police had no obligation in the circumstances here to ask Pikyavit what they should do if they found the door locked, as it was up to Pikyavit to limit or condition the search if that was his intent. *See Jimeno*, 500 U.S. at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization."); *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) ("The scope of the consent to search is limited by the breadth of the consent given."); *United States v. Kim*, 27 F.3d 947, 957 (3d Cir. 1994) ("Of course [defendant] could have limited his consent to certain items, but he had the burden to express that limitation . . . ."). It was reasonable for the police to conclude that Pikyavit would have wanted them to enter the home if it could be done quickly and without damaging the premises. And, in fact, the police were able to slip the lock without damaging either the lock or the door itself.[2]

---

[2] We are not presented with a situation where police had to kick in a door or break a window to gain entry. *See United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000) (observing a search may be "'so invasive or destructive' as to go beyond the scope of the search"). In this case, slipping the lock was not

(continued...)

Pikyavit's subjective motivations are irrelevant. *See Maynes-Ortega*, 857 F.2d at 689. An objectively reasonable interpretation of Pikyavit's consent is that he gave the officers general consent to enter his home even if they found it locked. The fact that either Pikyavit did not know whether the home was locked, or whether his brother had locked the home to prevent unauthorized entry, does not invalidate the officers' reasonable understanding of what Pikyavit had asked them to do.

Second, it was reasonable for the officers to enter the home because Pikyavit initiated the encounter and specifically requested they search inside the home for exculpatory evidence. Detective Jacobson and Deputy Carter both testified, and the district court found, Pikyavit *asked them* to search inside the home for the evidence he wanted preserved. His goal was for police to see evidence that would let him off the hook, a goal that was plainly furthered by the police using reasonable means to open the locked door. The record indicates Pikyavit was the sole occupant of the home, and entry did not compromise any other privacy interests. *Cf. Georgia v. Randolph*, 547 U.S. 103 (2006) (focusing

---

[2](...continued)
unreasonable given the objective of the occupant, which was for the police to find exculpatory evidence. Nor would it make any difference if Pikyavit secretly hoped the police would be thwarted in entering the home. *See Maynes-Ortega*, 857 F.2d at 689 (describing as "somewhat preposterous" the argument that "consent given by appellant [] to search [his] car was invalid because when he gave it he thought that such consent would be futile since he did not have the trunk key").

consent inquiry on societal understandings and norms regarding privacy interests).

The fact that Pikyavit lived alone but was in jail at the time and unavailable to assist the officers bolsters their belief that reasonable entry—even slipping the lock—was of the essence of Pikyavit's consent. If Pikyavit had been present with the officers, there is little doubt he would have opened the door for them. *See United States v. Prazak*, 500 F.2d 1216, 1217 (9th Cir. 1974) (concluding that when defendant is absent, test for scope of consent is "whether what the officer did can be said to have been what [defendant] himself reasonably would have done had he been able to act for himself").

The assurances Pikyavit gave the officers that the home would be open further solidified their reasonable interpretation Pikyavit wanted them to enter. Deputy Carter testified,

> [Pikyavit] stated the house would be opened. He said that his brother just went in there and his brother would have left it open because his brother told him that they needed to have us come out there, that he knew we would be coming. He told me that the house would be unlocked and it was hardly ever locked.

R., Vol. V at 21. Thus, the police had several reasons to believe the door would be unlocked: Pikyavit's brother had recently been in the house, and it was common for Pikyavit's house to be unlocked. They had *no reason*, however, to believe the house would be locked or—further, that if the house were locked, they should not enter it.

-12-

Finally, the urgency with which Pikyavit asked Jacobson and Carter to search his home would have led a reasonable person to believe they had permission to enter even if it were locked. Over one week had passed since the night of the fight, during which time Pikyavit had been in jail. Pikyavit described his house as a "crime scene" that he wanted properly and completely "documented." R., Vol V at 42–43. Because of the physical nature of the evidence, the possibility it would be disturbed, destroyed, or otherwise compromised was obvious to all parties involved.

Pikyavit thus conveyed a strong sense of urgency to the officers. Pikyavit initiated the encounter with Detective Jacobson by filling out an inmate request form. On the form, Pikyavit included the acronym "ASAP." R., Vol. V at 15. He wanted to talk to the officers and to initiate the search for evidence as quickly as possible.

Moreover, both Jacobson and Carter testified Pikyavit was "insistent" they search his home for evidence of the fight. *Id.* at 39, 19. For example, at the suppression hearing Carter testified, "[Pikyavit] was quite insistent that we go out there [to the home]." *Id.* at 19. He also described Pikyavit as "excited" during their conversation, and "very, very insistent" that the investigation commence. *Id.* at 20. In fact, Carter complied with Pikyavit's request and immediately proceeded to the home.

This is not to say a reasonable police officer, on encountering facts materially different than those described by Pikyavit, would not reasonably conclude a defendant's consent to search was limited. We can imagine circumstances where the property to be searched varied so widely from the defendant's description, for example, that a reasonable police officer would have to conclude a search would exceed the scope of the consent. Here, the circumstance of the locked door did not vary materially from what the police had been told by Pikyavit. The police therefore had no obligation to obtain further consent.

In sum, based on the totality of the circumstances, the district court's determination that the police stayed within the scope of Pikyavit's consent when they entered his locked home was not clearly erroneous.

*2. Consent to search the entire house*

The second issue is whether the officers' search of rooms off the main hallway exceeded the scope of Pikyavit's consent. We conclude a typical reasonable person would have believed the consent extended to these rooms. "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251. Although Pikyavit asserts he limited his consent to the living room and kitchen, there is ample evidence he consented to a search of the entire home. Indeed, the officers and Pikyavit agreed the express object of the search was to

find evidence of a fight inside the home which would exculpate Pikyavit, evidence that could be found in any room of the house.

Detective Jacobson testified Pikyavit asked him to search inside the entire home for the evidence he desired to be preserved. Jacobson said Pikyavit told him "there was potentially a crime scene inside of the home being indicated by blood inside of the house, a weapon of some kind on the outside." R., Vol. V at 42. Thus, any room in which blood indicative of a fight could be found was encompassed within the scope of the consent.

Deputy Carter's testimony corroborated the conclusion Pikyavit consented to a search of the home's general living quarters. Carter testified that Pikyavit said "his home was really a bad blood bath, bad crime scene, [and] said that the *whole house* was turned up and the fight actually had taken place there." *Id.* at 14–15 (emphasis added). Carter also explained that Pikyavit had said, "it was just a complete disaster there. That there is blood covering the house. His hair was *all over the house*. . . . That, you know, it was just really a bad scene." *Id.* at 18 (emphasis added).

Additionally, Deputy Carter testified he looked into rooms other than the kitchen and living room because he thought Pikyavit may have relayed information incorrectly from his brother. Pikyavit did not know exactly where the evidence was located in the home, as he received the information from his brother. Jacobson testified, "I recall him telling me that his brother had told him that there was blood

in the kitchen." *Id.* at 41. When the officers originally arrived at the scene, they looked in the kitchen and living room, but found no evidence of a fight in either. The furniture was not overturned and there was no blood or hair to be seen. Finding no evidence of the fight in these two main rooms, the officers proceeded to open doors off of the main room. Carter recalled his thinking: "[Pikyavit] may have been not understanding the description exactly so we did open the door to the first room right off—off of the living room area there." R., Vol. II at 38–39. In that first room, ammunition was found.

The burden was on Pikyavit to limit the scope of the search if he desired to do so. "[A] defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *Gordon*, 173 F.3d at 766 (citing cases). In this case, of course, Pikyavit was not present at his home when the officers arrived to search. He therefore could not have objected at that time if the officers were exceeding the scope of his consent. But Pikyavit knew he would not be present, and the onus was on him to carefully delimit the scope of the search. *E.g.*, *Jimeno*, 500 U.S. at 252; *Kim*, 27 F.3d at 957.

An objectively reasonable interpretation of Pikyavit's statements was that he wanted the police to find exculpatory evidence throughout the house. He did not limit his search to any particular room or rooms. As the officers were looking for evidence of a fight, it was reasonable to look into a room off of the main hallway.

-16-

*Cf. Kimoana*, 383 F.3d at 1223 ("Consent to search for specific items includes consent to search those areas or containers that might reasonably contain those items."); *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994) (noting "general consent to search includes closed containers within the vehicle"); *United States v. Elliott*, 107 F.3d 810, 814–15 (10th Cir. 1997) ("The scope of a search is generally defined by its expressed object, and is limited by the breadth of the consent given." (internal marks omitted)).  The expressed object of this search was categorical—evidence of a fight—not spatial.  The officers carefully limited the scope of their search to this expressed object.  They did not conduct a detailed search of the adjacent rooms, but rather merely opened doors in search of evidence of a fight.  To do less would have subjected them to a claim of failure to thoroughly look for exculpatory evidence.  Ammunition was found in plain view in the first room off the main hallway.  When it appeared an expanded and more detailed search was necessary, the officers appropriately sought and obtained a search warrant.

\* \* \*

In sum, a reasonable officer would have understood Pikyavit to give consent to (1) enter his home even if the doors were locked, and (2) search rooms other than the kitchen and living room.  Pikyavit said there was blood and other evidence of the fight throughout the house—not just in the kitchen and living room.  Moreover, Pikyavit was relaying the information second-hand (from his brother), so

it was reasonable to conclude Pikyavit did not know, or could not precisely remember, the exact location of the evidence. The district court's determination that the officers stayed within the scope of Pikyavit's consent to search was not clearly erroneous.

## III. Conclusion

For the reasons set forth above, we AFFIRM.