**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 17, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARTIN AGUILAR,

      Defendant - Appellant.

No. 12-2047

(D. N.M.)

(D.C. No. 1:10-CR-03101-MCA-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **SEYMOUR**, and **MURPHY**, Circuit Judges.

---

## I.  Introduction

Defendant-appellant Martin Aguilar entered a conditional plea of guilty, pursuant to Fed. R. Crim P. 11(a)(2), to two counts of violating the Bald and Golden Eagle Protection Act ("Eagle Protection Act") by taking a bald eagle and possessing bald eagle parts without a permit. *See* 16 U.S.C. § 668.  Consistent with his conditional plea, Aguilar now appeals two adverse rulings of the district court: an order denying his motion to suppress evidence and an order denying his

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

motion to dismiss the indictment.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court affirms.

## II.    Background

Aguilar is an enrolled member of Kewa Pueblo (formerly known as the Pueblo of Santo Domingo), a federally recognized Indian tribe.  Indian Entities Recognized and Eligible To Receive Services From the Bureau of Indian Affairs, 77 Fed. Reg. 47,868, 47,870 (Aug. 10, 2012).  On February 12, 2010, Special Agents Jason Riley and Russell Stanford of  the United States Fish and Wildlife Service (USFWS) began investigating an anonymous tip that Aguilar had killed eagles on tribal land the previous weekend.  The agents drove onto the Pueblo and conducted surveillance near the Rio Grande for about three hours, beginning around 5:30 a.m.  They then drove to the Kewa Pueblo government headquarters and spoke to tribal officials about their investigation.  The agents asked the tribal officials if they knew anything about eagles being killed.  The tribal officials responded they had spoken about such a matter with a tribe member, whom they would not identify.  It was tribal policy to assign a tribal officer as an escort when outsiders were conducting business within the main village of the Pueblo. However, because the agents did not tell the tribal officials they would be conducting their investigation within the village, the tribal Governor did not assign a tribal officer to escort them.

The agents drove to the main village of the Pueblo and located Aguilar's house, which he shared with his sister and mother. They knocked on the door and spoke with Aguilar's sister. After identifying themselves as USFWS special agents, they asked to speak with Aguilar, and were informed he was not home. The agents returned to their vehicle and left the Pueblo, returning to Aguilar's house later and waiting for him to come home. Some time later, Aguilar's sister invited the agents to come into the house because Aguilar was on the phone and wanted to speak to the agents. Special Agent Stanford spoke to Aguilar, identifying himself and stating he had some questions about eagle feathers. Aguilar told Agent Stanford he was at a Sam's Club in Albuquerque and agreed to meet the agents outside the store. The agents arrived at the Sam's Club twenty to twenty-five minutes later, where they found Aguilar in the food court. The agents explained to Aguilar that they wanted to talk with him based on information he shot two eagles the previous weekend. He perceived the agents as polite and courteous; they told him he was not under arrest, did not have to speak with them, and could leave.

Aguilar was very cooperative with the agents. He admitted he shot one eagle the previous weekend and his son shot another. He explained that he was a medicine man and had killed the eagles for their feathers. Aguilar told the agents he had been called into the Governor's office two days earlier and that, when questioned about the incident, he was told to stop killing eagles. He also told the

agents he had the feathers in a basket in a workshop behind his house. Special Agent Stanford asked if he could see the feathers, and Aguilar agreed to meet the agents at his house later that afternoon. The agents returned to the Pueblo around 3:00 p.m. to find Aguilar already home. Aguilar had moved the eagle parts from a shed into his house, and invited the agents to examine the feathers. The agents asked if they could look inside the shed where he kept the feathers, and he responded they could not. He then told the agents he had telephoned tribal officials and wanted to wait until they arrived before proceeding further. Tribal police officer Kerwin Tenorio arrived minutes later and discussed the investigation with Special Agent Stanford. After conferring with Aguilar in their native language, Keres, Officer Tenorio told the agents they should immediately report to the Governor at his office. Prior to doing so, the agents seized a .22 magnum rifle, eagle feathers, and a pair of mounted eagle wings.

Aguilar was charged in a four-count indictment. Counts 1 through 3 were brought under the Eagle Protection Act, 16 U.S.C. § 668.[1] Aguilar moved to suppress the evidence seized at his home, arguing, inter alia, that the agents obtained his consent to speak with them and search his home under the false pretense that they were acting with the approval of the Governor of the Pueblo.

---

[1]Count 4, which related to the illegal taking of a red-tailed hawk also found on Aguilar's property, was brought under the Migratory Bird Treaty Act, 16 U.S.C. §§ 703, 707(a).

Aguilar also moved to dismiss the indictment, arguing the Eagle Protection Act impermissibly burdened his religious practices in violation of the Religious Freedom Restoration Act ("RFRA"). *See* 42 U.S.C. § 2000bb-1. The district court denied both motions, and Aguilar now appeals.

## III. Discussion

### A. Motion to Suppress

When reviewing a Fourth Amendment challenge to a search by police, this court "review[s] the district court's factual findings for clear error, and the ultimate reasonableness of the search *de novo*." *United States v. Pikyavit*, 527 F.3d 1126, 1129 (10th Cir. 2008). In the course of this review, we view the facts in the light most favorable to the prevailing party below, in this case the government. *Id.* at 1130. A finding is clearly erroneous only if it "is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *United States v. Quaintance*, 608 F.3d 717, 721 (10th Cir. 2010) (quotation omitted).

Aguilar argues his consent to the agents to enter his home and view the eagle feathers was involuntary when considering the totality of the circumstances. In particular, Aguilar argues the district court understated the significance of his belief that the agents were acting under the authority of the Pueblo Governor, whom, he argues, he was bound to obey according to Pueblo custom and tradition. In response, the government argues Aguilar's subjective beliefs are irrelevant to

-5-

the issue of voluntariness of consent insofar as there is no indication the agents were aware of or took advantage of them. The district court acknowledged there is conflicting authority as to whether subjective facts about a defendant, unknown to officers at the time consent to search is given, are relevant in determining whether consent is voluntary. *See United States v. Sims*, 428 F.3d 945, 953 n.2 (10th Cir. 2005); *United States v. Grap*, 403 F.3d 439, 444 (7th Cir. 2005) (discussing "the apparent difference between . . . approaches to voluntary consent . . . stem[ming] from the weight to be accorded the evidence presented to a reasonable officer asking for consent as opposed to some other facts, unknown to the officer, but later argued to the reviewing court.").

The district court nonetheless concluded the consent to search was valid regardless of the extent to which Aguilar's subjective state of mind informed the analysis:

> The Court concludes that if the voluntariness of Defendant's consent is measured by an objective standard limited to . . . what the special agents knew or should have known about Defendant's state of mind, Defendant's subjective concern that he might be acting contrary to the Governor's will if he declined to cooperate is irrelevant to the voluntariness inquiry due to the absence of evidence that the special agents knew or had reason to know of Defendant's subjective state of mind. Alternatively, the Court concludes that if Defendant's unexpressed subjective concern is part of the "totality of the circumstances," it should not be given significant weight, *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993), and that due to the absence of evidence of coercion or duress on the part of the special agents, Defendant's subjective concern that a failure to cooperate with the special agents might be viewed as disrespect for the Governor is insufficient to render his consent involuntary.

Order Den. Mot. to Suppress Evid. at 19 (footnote omitted). Elsewhere in its order, the district court found that, if Aguilar believed the agents were acting at the direction of the Governor, he would have felt obliged to cooperate with them. The court also found, however, that at the time Aguilar agreed to meet with the agents at the Sam's Club, he was "*unsure* whether the investigation by the USFWS had been instigated by the Governor or was being conducted with his approval." *Id.* at 14 (emphasis added). The district court arrived at this finding by noting that, prior to the agents' arrival, Aguilar had already spoken with the Governor about his having killed eagles on tribal land. From this, the court found it was possible Aguilar thought the Governor informed the USFWS about his killing of eagles, but that it was equally likely Aguilar considered the matter to have been resolved to the Governor's satisfaction during their meeting.

Aguilar challenges these findings on several grounds. First, he argues the district court disregarded the effect of the agents' entry into the Pueblo's main village and Aguilar's home on Aguilar's state of mind. As a member of the Pueblo, Aguilar would have understood Pueblo custom and law to prohibit such entry unless the Governor had explicitly authorized it. Relatedly, Aguilar argues the district court understated the significance of Aguilar's concern that he was bound to cooperate with the agents to meet his obligations to the Governor. Aguilar also argues there were other coercive circumstances attendant to his consent to search, including statements by the agents that it was in his best

interest to tell the truth, his own impressions that he would not be prosecuted, and the lack of evidence Aguilar was advised of his right to refuse consent to the search. These arguments do not come close to demonstrating that the district court's contrary factual findings were clearly erroneous. "To be clearly erroneous, a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer." *Quaintance*, 608 F.3d at 721 (quotation omitted). Aguilar's challenges to the district court's factual findings invite this court to reconsider and reweigh evidence already passed upon by the district court. As such, they are insufficient to demonstrate clear error.

It is therefore unnecessary to decide the extent to which a defendant's subjective perceptions unknown to police officers are relevant in assessing the voluntariness of a consent to search under the Fourth Amendment. Even assuming the law is as Aguilar claims, he advances no persuasive argument undermining the district court's finding that his consent to search was voluntary in light of the totality of the circumstances. The district court therefore correctly denied his motion to suppress.

B.      Motion to Dismiss

Appealing the denial of his motion to dismiss, Aguilar argues the Eagle Protection Act impermissibly burdens his practice of religion in violation of RFRA. The relevant provisions of RFRA provide:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1.[2]  In *United States v. Friday*, 525 F.3d 938, 952–56 (10th Cir. 2008), this court rejected a virtually identical argument by a similarly situated defendant.  We held that the Eagle Protection Act, and its attendant permitting process which allows for the taking of live eagles for religious purposes by members of federally recognized Indian tribes under certain circumstances, was the least restrictive means of furthering compelling governmental interests in protecting eagles and protecting the religion of federally recognized Indian tribes.  *Id.* at 956; *see also United States v. Wilgus*, 638 F.3d

---

[2] "In *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997), the Supreme Court held that RFRA could not be constitutionally applied to the states as an exercise of Congress' power to enforce the Fourteenth Amendment.  RFRA can, however, be constitutionally applied to the federal government, as an exercise of Congress' Article I, Section 8 powers under the Necessary and Proper Clause." *United States v. Wilgus*, 638 F.3d 1274, 1279 (10th Cir. 2011).

1274, 1288 (10th Cir. 2011) ("We . . . evaluate the validity of the Eagle [Protection] Act under RFRA with reference to two compelling governmental interests: protecting bald and golden eagles, and fostering the culture and religion of federally-recognized Indian tribes."). Aguilar acknowledges his challenge to the Eagle Protection Act is similar to the position which was rejected in *Friday*, but asserts this court should reconsider the balancing of interests in light of the delisting of the bald eagle from the endangered species list. *See* Endangered and Threatened Wildlife and Plants; Removing the Bald Eagle in the Lower 48 States From the List of Endangered and Threatened Wildlife, 72 Fed. Reg. 37,346, 37,372 (July 9, 2007); 50 C.F.R. 17.11(h). This argument is unpersuasive. Contrary to Aguilar's suggestions on appeal, the delisting of the bald eagle occurred before *Friday* was decided. In fact, the court in *Friday* made reference to the delisting in the course of its discussion. 525 F.3d at 954. Additionally, in delisting the bald eagle, the USFWS specifically cited the Eagle Protection Act, among other federal statutes, as providing the sufficient protections to ensure the continued health of the eagle population. 72 Fed. Reg. at 37,353, 37,362–64. Therefore, the delisting, standing alone, does not require this court to recalculate the interests involved and means required to serve those interests in light of Aguilar's RFRA challenge. Because the delisting is the only changed circumstance Aguilar points to as necessitating such a recalculation, the district court correctly denied Aguilar's motion to dismiss.

## IV. Conclusion

For the foregoing reasons, the orders of the district court are **affirmed**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge